**Mildred L. JOSEPH and Coleen H. Finks, Plaintiffs,**

**and**

**Lloy M. Glover, Plaintiff-Intervenor,**

**v.**

**Christopher S. BOND and Ray S. James, Defendants.**

**and**

**Hope W. SMALL, Plaintiff,**

**and**

**Phyllis Ferguson, Plaintiff-Intervenor,**

**v.**

**Christopher S. BOND and Ray S. James, Defendants.**

**Nos. 81–0510–CV–W–1 and 81–4161–CV–C–0.**

United States District Court, W. D. Missouri, W. D.

Oct. 7, 1981.

**1364**

Arthur A. Benson, II, Darwin E. Johnson, Kansas City, Mo., for plaintiff-intervenor.

Michael Boicourt, Asst. Atty. Gen., State of Missouri, Jefferson City, Mo., for defendants.

MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDERS DIRECTING THE ENTRY OF JUDGMENT

JOHN W. OLIVER, Senior District Judge.

I.

This consolidated case involves but one of the many forms of the general practice of political patronage. The various forms of that general practice, as the Supreme Court noted in *Elrod v. Burns*, 427 U.S. 347 at 353, 96 S.Ct. 2673 at 2679, 49 L.Ed.2d 547 (1976), involve, at the very least, (a) the dismissal of public employees on a partisan basis; (b) the placing of loyal supporters in government jobs that may or may not have been made available by political discharges; (c) the awarding of lucrative government contracts on a partisan basis; (d) the granting of improved public services for favored wards; and even (e) partisan practices by members of the judiciary in the appointment of receiverships, trusteeships, and refereeships.

The primary legal question presented is whether the First and Fourteenth Amendments to the Constitution protect from partisan dismissal five persons appointed as agents of the Department of Revenue of the State of Missouri pursuant to Section 136.055, R.S.Mo.1978, all of whom, under the factual circumstances, are satisfactorily performing their jobs, solely because of their political beliefs. The answer to that question turns in large part on whether the principles of constitutional law enunciated by the Supreme Court in *Elrod v. Burns, supra*, and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), are applicable to the factual circumstances of this case, or whether, as Judge Cahill concluded in *Sweeney v. Bond*, 519 F.Supp. 124, Eastern District of Missouri, 1981, and as Judge Nangle concluded in *Fox & Company v. Schoemehl*, 519 F.Supp. 849, Eastern District of Missouri, 1981, application of the principles of constitutional law enunciated in those cases must be limited to those actual circumstances which involve only the partisan dismissal of public employees.

We shall find and conclude that the principles of constitutional law enunciated in *Elrod* and *Branti* must be applied to a case which, on its facts, involves a form of political patronage, which involves the partisan dismissal of persons appointed as Section 136.055 agents on the sole basis of their

political beliefs. Application of those principles requires that the five plaintiffs in this case be granted appropriate equitable relief under the factual circumstances established by the stipulation of the parties and by the greater weight of the credible evidence.[1]

As will be apparent from our findings of fact, most of the factual circumstances of these cases are undisputed. We will first state the undisputed facts; then resolve the areas of factual dispute; and finally state our conclusions of law.

## II. *Findings of Fact*

### A. *Undisputed Facts*

Defendants, pursuant to the agreed procedure under which this case was submitted, proposed fifty-five separate findings of fact. Plaintiffs concede, and we agree, that the following findings proposed by defendants are in fact supported by the stipulation of the parties or by a preponderance of the credible evidence. We therefore make the following findings of fact in the language proposed by defendants:

1. The plaintiffs, Mildred L. Joseph, Coleen H. Finks, Lloy M. Glover, Hope W. Small, and Phyllis Ferguson, are residents of the State of Missouri within the jurisdiction of the United States District Court for the Western District of Missouri. (Stipulation paragraph 4)

2. Each of the plaintiffs is a fee agent for the Missouri Department of Revenue. (Stipulation paragraph 4)

3. Plaintiff Joseph is the fee agent in Grandview, Missouri. (Stipulation paragraph 11)

4. Plaintiff Finks is the fee agent in Clinton, Henry County, Missouri. (Stipulation paragraph 12)

5. Plaintiff Glover is the fee agent in Gladstone, Clay County, Missouri. (Stipulation paragraph 13)

6. Plaintiff Small is the fee agent in Kahoka, Missouri. (Stipulation paragraph 14)

7. Plaintiff Ferguson is the fee agent in Savannah, Missouri. (Stipulation paragraph 15)

8. All of the plaintiffs are active Democrats and all were appointed as fee agents during the administrations of governors who were also Democrats. (Stipulation paragraph 4)

9. Plaintiffs Joseph, Small, Glover and Ferguson were appointed during the administration of former Governor Joseph Teasdale to replace Republicans. (Stipulation paragraph 4)

10. Plaintiff Finks was appointed during the administration of former Governor Warren Hearnes and was not terminated during the first administration of Governor Bond. (Stipulation paragraph 4)

11. Prior to her appointment as fee agent, each plaintiff was active in partisan party politics and supported the candidacies of persons running for public office on the Democratic ticket. (Stipulation paragraph 5)

12. Each plaintiff contributed time or money, or both, to the 1976 gubernatorial candidacy of Joseph Teasdale. (Stipulation paragraph 5)

13. Each of the plaintiffs contributed time or money, or both, to the 1980 gubernatorial candidacy of Joseph Teasdale. (Stipulation paragraph 5)

14. Each of the plaintiffs is presently free to, and does continue to, assert her partisan support of the Democratic party. (Stipulation paragraph 5)

15. Defendant Christopher S. Bond is the Governor of the State of Missouri, having been inaugurated on January 12, 1981. (Stipulation paragraph 6)

16. Defendant Ray S. James is the Director of the Missouri Department of Reve-

---

1. The record shows that plaintiffs' complaints included prayers for damages as well as prayers for equitable relief. The record also shows, however, that at the outset of the trial, plaintiffs abandoned their prayers for damages and elected to proceed only on their "prayers for equitable relief and attorney's fees and expenses." (Tr. 17)

The case has been submitted and will be ruled on that basis.

nue, and was appointed as such by defendant Bond on January 13, 1981. (Stipulation paragraph 6; Tr. 26–27)

17. Defendants Bond and James are Republicans, whose official residences are within the jurisdiction of the United States District Court for the Western District of Missouri. (Stipulation paragraph 6)

18. All of the plaintiffs have been notified by defendant James that their appointments as fee agents have been terminated. (Stipulation paragraph 7)

19. Although the plaintiffs have been notified of their terminations as fee agents, the defendants have allowed them to continue to do business for the Department of Revenue pending the disposition of this case in the District Court, and defendants have agreed not to effectuate the final terminations of the plaintiffs or to install successor fee agents in the offices held by the plaintiffs, except for cause, until final judgment is entered by this Court. (Stipulation paragraph 2)

20. Defendant James has appointed successors to operate the fee agent offices held by the plaintiffs, entered into contracts with successors to those offices, and begun the training of successors. (Stipulation paragraph 7)

21. All of the persons appointed by defendant James to replace these specific plaintiff agents are Republicans. (Stipulation paragraph 7)

22. A substantial majority of, but not all, fee agent appointments made by James have been Republicans. (Stipulation paragraph 7)

23. Fee agents are authorized under § 136.055, RSMo 1978, to issue licenses and collect taxes and fees. (Stipulation paragraph 8)

24. Section 136.055, RSMo 1978, provides as follows:

1. Any person who is selected or appointed by the state director of revenue to act as an agent of the department of revenue, whose duties shall be the sale of motor vehicle licenses and the collection of motor vehicle sales and use taxes un-

der the provisions of section 144.440, RSMo, and *who receives no salary from the department of revenue* shall be authorized to collect from the party requiring such services additional fees as compensation in full and for all services rendered on the following basis:

(1) For each motor vehicle or trailer license sold, renewed or transferred— , one dollar;

(2) For each application or transfer of title—one dollar;

(3) For each chauffeur's, operator's or driver's license—one dollar;

(4) No notary fee or other fee or additional charge shall be paid or collected.

2. This section shall not apply to agents appointed by the state director of revenue in any city where the department of revenue maintains an office. (Emphasis added) (Stipulation paragraph 8)

25. There are 158 fee agent offices in Missouri. (Stipulation paragraph 8)

26. At the time of Governor Bond's inauguration, 21 fee agent offices were operated by nonpartisan civic organizations, and one office was operated by a municipality. (Stipulation paragraph 8)

27. [Rejected]

28. Since his appointment as Director of Revenue, James has terminated 89 fee appointments held by Democrats and 3 nonpartisan civic organizations. (Stipulation paragraph 8)

29. James has appointed agents to fill 104 fee agencies including 10 reappointments of existing agents of which 5 were nonpartisan civic organizations. (Stipulation paragraph 8)

30. Four new agents appointed by James are civic organizations. (Stipulation paragraph 8)

31. The majority of the remaining new appointees have been Republicans although Democrats have also been appointed as replacements in a few agencies. (Stipulation paragraph 8)

32. As of the date the stipulation was entered into in this case, 47 fee agents who are Democrats had not been terminated by the Republican administration of the defendants, and 5 fee agents who were Democrats have been reappointed. (Stipulation paragraph 8)

33. [Rejected]

34. [Rejected]

35. [Rejected]

36. The plaintiffs specifically, and fee agents in general, are not public employees of the State of Missouri. (Stipulation paragraphs 9 and 10; Admission in Plaintiffs' Pretrial Brief)

37. [Rejected]

38. [Rejected]

39. From her fee agent business in Grandview, Missouri, plaintiff Joseph enjoyed a net income of $44,200 from 136,408 total transactions in 1980. (Stipulation paragraph 11)

40. As Clinton, Missouri, fee agent, plaintiff Finks enjoyed a net income of $18,310 from 32,072 total transactions in 1980. (Stipulation paragraph 12)

41. As the fee agent in Gladstone, Missouri, plaintiff Glover enjoyed a net income of $36,000 from 85,335 total transactions in 1980. (Stipulation paragraph 13)

42. From her fee agent business in Kahoka, Missouri, plaintiff Small enjoyed a net income of $11,000 from 12,829 total transactions in 1980. (Stipulation paragraph 14)

43. As fee agent in Savannah, Missouri, plaintiff Ferguson enjoyed a net income of $14,000 from 18,787 total transactions in 1980. (Stipulation paragraph 15)

44. [Rejected]

45. [Rejected]

46. Fee agents do not make policy for the operation of the Department of Revenue, for they exercise little discretionary responsibility and have no supervisory function over any but their own employees. (Stipulation paragraph 17)

47. Fee agents do, however, have almost autonomous control over the operation of their individual fee agencies.

48. No confidential relationship exists between fee agents, present or prospective, and the Director of Revenue or the Bond administration. (Stipulation paragraph 18)

49. The staff of Governor Bond in making recommendations, and defendant James in making appointments, do consider the partisan political affiliation of the successors to the plaintiffs. (Stipulation paragraph 19)

50. Governor Bond's staff and defendant James have reviewed numerous recommendations by Republican leaders suggesting replacements for incumbent fee agents. (Stipulation paragraph 19)

51. [Rejected]

52. [Rejected]

53. Plaintiffs Finks, Small, Glover and Ferguson were not terminated as fee agents as a result of misfeasance or malfeasance, i. e., they were not terminated because they were bad fee agents. (Stipulation paragraph 20)

54. Defendant James had neither met nor spoken with plaintiffs Finks, Small, Glover and Ferguson prior to their terminations, and defendant James terminated these plaintiffs because their political activities did not demonstrate the dependability and allegiance he deemed necessary for continued service as fee agents. (Stipulation paragraph 20)

55. [Rejected]

### B. *Resolution of Disputed Facts*

In this part of our findings of fact we will discuss other findings proposed by the parties and make additional findings of fact which are required under the law applicable to this case.

#### 1. *Status of a Missouri Fee Agent Appointed Pursuant to § 136.055*

Defendants proposed the following finding in their paragraph 37:

The plaintiffs specifically, and fee agents in general, are not public officers of the State of Missouri. (Stipulation 16; Admission in Plaintiffs' Pretrial Brief)

Plaintiffs, on the other hand, proposed the following finding in their paragraph 24:

> Fee agents perform the duties of public officers by acting on behalf of the State of Missouri and they perform for the public those duties specified in Chapter 136, RSMo.1978 (Stipulation # 8) which duties are the sovereign function of the government."

Both sides rely in part on paragraphs 8 and 16 of the stipulation to support their respective proposed findings.[2] Paragraph 8 of the stipulation reflects the parties' agreement that "[f]ee agents are authorized under § 136.055, RSMo 1978, to issue licenses and collect taxes and fees."[3]

The parties agreed in paragraph 16 of the stipulation that:

> 16. Motor vehicle license agents have no specific term of office or appointment to fulfill nor any tenured rights. Fee agents are not protected from arbitrary dismissal by the merit system statutes of Missouri. Fee agents are not administered an oath of office. Fee agents execute no official bond to cover misfeasance or malfeasances of their agency duties. The appointment of the plaintiffs, and of all fee agents, is made solely by letter indicating the creation of an agency relationship. The plaintiffs, and all fee agents, have not been commissioned pursuant to the provisions of Article IV, § 5, Constitution of Missouri (1945).

For reasons which are not apparent, the State of Missouri, by its enactment of Section 136.055 in 1951, vested authority in the State Director of Revenue to select or appoint any person "to act as an agent of the department of revenue." Section 136.055 provided that the duties of such an agent "shall be the sale of motor vehicle licenses and the collection of motor vehicle sales and use taxes under the provisions of Section 144.440, RSMo." And, most important, Section 136.055 authorized the person selected or appointed "to collect from the party requiring such services additional fees as compensation in full for all services rendered" on the fixed schedule of fees set forth in the statute.

Defendants in their proposed conclusions of law urge this Court to adopt Judge Cahill's finding in *Sweeney* that Missouri fee agents have a "novel status" and a "unique structure." *See* paragraph 11 of defendants' proposed conclusions of law. We quite agree with Judge Cahill's findings in that regard and, as suggested by defendants, adopt those findings as our own.

Judge Cahill also found and concluded in *Sweeney* that none of the fee agents involved in that case held, "nor would any of the Bond appointees hold any confidential relationship to the Director of Revenue because of their fee agent status" (*Sweeney,* p. 130). Consistent with that finding, the parties have so stipulated in this case. Paragraph 18 of the stipulation provides that "[N]o confidential relationship exists between fee agents, present or prospective, and the Director of Revenue or the Bond administration."

Judge Cahill further found and concluded in *Sweeney* that the fee agents involved in

---

**2.** Defendants also cited the "Admission in Plaintiffs' Pre-Trial Brief" to support its proposed paragraph 37. That citation is an obvious reference to statements made at the outset of plaintiffs' brief which stated that "[p]laintiffs do not intend to dispute the nature of the business relationship between themselves and the State; they do not contend they are employees but acknowledge that such relationship is that of an independent contractor." Plaintiffs' pretrial brief added that "[i]t is plaintiffs' firm belief that, as independent contractors, they are endowed ... with the same First Amendment rights as are employees ...."

Those statements, of course, do no more than reflect plaintiffs' consistent position that the

principles of constitutional law stated and applied in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) were not, as Judge Cahill had earlier concluded in *Sweeney v. Bond,* 519 F.Supp. 124, Eastern District of Missouri, 1981, expressly limited to public employees but that plaintiffs, assuming they are independent contractors, were entitled to the same First Amendment protection as public employees.

**3.** Paragraph 8 of the stipulation quoted Section 136.055 in its entirety. That section is quoted in full in paragraph 24 of the undisputed findings of fact above.

that case "are hardly known to the Governor or his staff, but clearly are the selected choices of political leaders throughout the state who wish to reward party loyalty with a patronage 'plum.' " (Ibid., p. 130).

We find and conclude that the facts and circumstances in this case require and support a similar finding in this case.

In our view it is not necessary that we complicate this case by pursuit of an inquiry as to whether Missouri fee agents should be labeled "public employees," "independent contractors," or even "public officers," within the meaning of Article IV, § 5 of the 1945 Missouri Constitution.[4] We are satisfied that Missouri fee agents appointed under Section 136.055 should be described and viewed in the same manner that they were described and apparently viewed by the Missouri General Assembly when it enacted that statute some thirty years ago.

Section 136.055 expressly vested authority in the state director of revenue to appoint any person "to act as an agent of the department of revenue" to perform specified duties in regard "to the sale of motor vehicle licenses and the collection of motor vehicle sales and use taxes."

It is our view that the question is not and should not be made a complicated one; a Missouri fee agent appointed under Section 136.055 is, as that statute provides, a government agent. Such a government agent is expressly authorized by law to perform particular duties, including the collection of money belonging to the State of Missouri, which he or she would not otherwise be authorized to perform, except for the legal power and authority conferred by Section 136.055.

The fact that Section 136.055 also confers authority on a Missouri fee agent, as a government agent, "to collect . . . additional fees as compensation . . . for all services

rendered" is the key factual circumstance which supported the finding made by Judge Cahill in *Sweeney*, namely, that persons officially appointed by the state director of revenue as a Missouri fee agent "clearly are the selected choices of political leaders throughout the state who wish to reward party loyalty with a patronage 'plum.' "

Section 136.055 does not confer on the Governor or any other political leader throughout the State the power of appointment of a Missouri fee agent; such power was vested in the director of the department of revenue. Yet the parties stipulated in paragraph 19 of the stipulation that "Mr. James [the incumbent Director of the Department of Revenue] would also testify that recommendations by the Governor and his staff are tantamount to appointment." The fact that the Governor as a political leader, and as a practical matter, is able to exercise such political power requires and supports a finding that the appointments of Section 136.055 fee agents, generally speaking, are but a part of the established practice of political patronage in this State.

A comparison of the salaries paid full time government employees in the Missouri Department of Revenue, as reported in Official Manual of Missouri, 1979–1980, p. 968 to 984, inclusive, with the stipulated facts in regard to the net income received by the incumbent Missouri fee agents involved in this case requires that we also make a finding that the established practice of partisan dismissal of incumbent Missouri fee agents, particularly on the occasion of a change of administration involving a shift of control from one major political party to the other, in order to make room for the new appointments to reward those politically faithful to the winning party, vividly reflects a form of the general practice of political patron-

---

4. Art. IV, § 5 of the 1945 Missouri Constitution provides that the governor shall "commission all [State] officers unless otherwise provided by law." That constitutional provision further provides that "all commissions shall be issued in the name of the state, signed by the governor, sealed with the great seal of the state and attested by the secretary of state." The parties have stipulated that no fee agents have ever been "commissioned" by the governor pursuant to that provision of the Missouri Constitution.

We view that stipulated fact as one of historical interest but not as a fact which is either relevant or material to the determination of this case.

age as it relates to the award of the lucrative government agent positions created by Section 136.055. Indeed, it is stipulated that one of the plaintiffs receives a net income from her appointment as a Section 136.055 fee agent which exceeds the salaries paid each of the defendants in this case. The net incomes enjoyed by the other four plaintiffs from their Section 136.055 fee agent offices far exceeds the salaries authorized for most of the full time employees of the Department of Revenue.

We further find, in accordance with paragraph 17 of the stipulation, that "fee agents do not make policy for the operation of the Department of Revenue" and that the position of a Missouri fee agent does not in any way involve any policy-making function. The facts and circumstances of this case require and support our ultimate finding that plaintiffs, as persons appointed as Missouri fee agents pursuant to Section 136.-055, are nonpolicy-making, nonconfidential government agents. We shall further find that all five plaintiffs were discharged from jobs they were satisfactorily performing upon the sole ground of their political beliefs. The reasons supporting that ultimate finding will be more fully stated in our discussion of the remaining findings proposed by the parties.

2. *How and Why Incumbent Missouri Section 136.055 Agents Are Dismissed and New Agents Are Appointed*

The record shows that plaintiffs agreed to findings proposed by defendants which state that "[t]he staff of Governor Bond, in making recommendations, and Defendant James, in making appointments, does consider the partisan political affiliation of the successors to the plaintiffs" (Admitted finding 49) and that "Governor Bond's staff and defendant James have reviewed numerous recommendations by Republican leaders suggesting replacements for incumbent fee agents" (Admitted finding 50).

Defendants proposed three additional findings in regard to the general subject under discussion. Defendant's proposed paragraphs 51 and 52 read as follows:

51. However, the recommendations made by Republican leaders, and specifically the Republican State Committee, for appointees for specific fee offices have not necessarily been followed by the defendants in making new appointments. (Tr. 53–54)

52. Fee agents must have partisan political allegiance in order to properly and loyally perform their functions as representatives of the administration. (Stipulation paragraph 19. Plaintiffs have offered no evidence whatsoever to rebut this stipulated belief of defendant James.)

Defendants' third proposed finding, stated in their paragraph 33, would have this Court find that " . . . political affiliation has not, for the administration of these defendants, dictated the fee office holders of all fee offices in Missouri." [5]

Plaintiffs deny that any of the three findings proposed by defendants have any support in the record. Plaintiffs further argue that "[d]efendants offered no evidence to rebut the inference that plaintiffs' fee agencies were terminated because of their political beliefs and associations." (Plaintiffs' Reply to Defendants' Answers to Plaintiffs' Proposed Findings of Fact and Conclusions of Law, p. 3). Plaintiffs propose that the Court make the following findings in regard to the subject under discussion:

10. Defendants used political affiliation as the test for fee agent appointments. (Trial Transcript, p. 39, lines 2–11)

11. Defendants established a mechanism as the test for fee agent appoint-

---

5. Defendants also proposed a finding in their paragraph 27 which, when read with their paragraphs 25 and 26, would paraphrase the following portion of paragraph 8 of the stipulation which stated that "there are 158 fee agent offices in Missouri. At the time of Governor Bond's inauguration, 21 fee agent offices were operated by nonpartisan civic organizations, and one office was operated by a municipality. All other fee agent offices were held by Democrats who had been appointed under the administrations of Democratic governors." We find and conclude that the proposed finding is not material to the determination of this case.

ments. (Trial Transcript, p. 39, lines 2–11)

a. Defendant James participated in the initiation of the mechanism's use (Exhibit 20);

b. Defendant Bond participated in the initiation of the mechanism's use (Exhibit 1);

c. The State Chairman of the Republican Party notified state committee members and county chairpersons of the procedures to follow in order to assist the Defendants in making fee agent appointments. (Exhibit 21)

12. Defendants used that mechanism to select loyal Republicans as successor fee agents.

a. On March 10, 1981 Defendant Bond sought speedy removal of the Democratic fee agent in St. Charles because of his political activities (Exhibit 17);

b. Defendant James discharged the Democratic fee agent in St. Charles on March 11, 1981 (Exhibit 18);

c. Defendant Bond specifically declined appointment of a Democrat as fee agent in Clay County because of Republican Party concerns in the county (Exhibit 5).

d. Defendant James received and acknowledged many fee agent nominations from offices of the Missouri Republican Party (Exhibits 7, 9, 11, 13, 22);

e. Fee agent appointments were made on the basis of recommendations solicited from Republican Party leaders by defendants (Exhibit 15);

f. Close political associates of the defendants received and advanced the cause of nominations of loyal Republican party members as fee agents (Exhibits 3, 4, 8, 12, 14, 16, 19).

13. Decisions on fee agent appointments were made only after consultation with the Defendant Governor Bond and his staff. (Exhibit 25, p. 13)

On the basis of the evidence adduced in *Sweeney,* Judge Cahill concluded that:

9. It is apparent to this Court that partisan political affiliation played a substantial role in all of the dismissals. The evidence was replete with recommendations to Governor Bond by Republican leaders suggesting replacements for the Democratic incumbents. Defendant James testified that he believed fee agents must have partisan political allegiance in order to properly and loyally perform their functions; he indicated that recommendations by the Governor and his staff would be tantamount to appointment. (*Sweeney,* p. 130)

In addition, Judge Cahill concluded that the Republican fee agents involved in *Sweeney* who were appointed to replace incumbent fee agents appointed by earlier Democratic administrations "are hardly known to the Governor or his staff, but clearly are the selected choices of political leaders throughout the state who wish to reward party loyalty with a patronage 'plum.'" (*Sweeney,* p. 130) While we do not know whether the evidence adduced in *Sweeney* supported Judge Cahill's patronage "plum" finding, we do know that the record before this Court supports such a finding in this case.

For purposes of the record on appeal, we expressly reject the findings of fact proposed by the defendants in their paragraphs 33, 51, and 52 because those proposed findings are not supported by evidence. We find, on the contrary, that the findings proposed by plaintiffs in their paragraphs 10 to 13, inclusive, are supported by the evidence for reasons we shall state in some detail.

3. *Detailed Discussion of Evidence Establishing Defendants' Practice of Political Patronage In Regard to Section 136.055 Fee Agents*

Plaintiffs' Exhibit 1 shows that on February 4, 1981, Governor Bond circulated a memorandum to Jim Chappell, identified in the record as "a supporter of Governor Bond in the 1980 gubernatorial election" and as a person who eventually received a fee agent appointment (Tr. 27); to Doug Russell, another "supporter of Governor Bond in the election;" to Jim Boillot, de-

fendant Bond's appointee as "Director of the Department of Agriculture" and as a "Republican supporter of Governor Bond" (Tr. 28); to Charlie Kiefner, "a long time supporter of Governor Bond," now with the Highway Patrol (Tr. 28); to defendant James, who had then been in office as an appointee of Governor Bond for less than a month (Tr. 26); and to Pat Murphy, who was unidentified in the record (Tr. 29). Copies of that memorandum also went forward to David T. Broeker, James Cumber, and Don E. Simple, all identified as assistants to Governor Bond (Tr. 29).

Governor Bond's February 4, 1981 memorandum (Pl. Exh. 1) invited all recipients to "lunch at the Mansion on Thursday, February 12 at noon." That memorandum enclosed a second memorandum which Governor Bond stated would be sent by John A. Powell, State Chairman of the Missouri Republican Party, to all Republican State committee members and county chairmen on the subject of "Motor Vehicle and Operators' (fee) offices." That second memorandum, dated February 6, 1981, was adduced in evidence as Plaintiffs' Exhibit 21.

Governor Bond stated in his February 4 memorandum that State Chairman Powell's February 6 memorandum would go out before the luncheon meeting scheduled for February 12, and stated that "I would appreciate your helping to explain it [State Chairman Powell's February 6 memorandum] to our county coordinators in your region" because "[i]t outlines the procedures that we are going to follow in approaching fee offices."

It is inconceivable to assume that Governor Bond was assembling a group of his close political supporters and appointees to "sit down and discuss . . . the many things developing" in regard to fee agent appointments unless everyone concerned clearly understood that the Bond administration was going to terminate a large number of Democratic incumbent fee agents and thereafter to make a large number of new Republican appointments. Certainly, de-

fendant James and all invitees to the luncheon must have understood that although the legal power and authority to remove and to appoint Section 136.055 fee agents was vested solely in the State Director of Revenue, as a practical matter, the partisan dismissals and the new appointments of fee agents would be made in accordance with the long established practice of Missouri political tradition. Indeed, the parties have stipulated in paragraph 19 of their stipulation that "recommendations by the Governor and his staff are tantamount to appointment."

Defendant James acknowledged with commendable candor that when he was interviewed shortly after the February 12, 1981 luncheon at the Governor's Mansion, by one Randy McConnell, a newspaper reporter for the Missouri Times, he had, for the most part, been accurately quoted in regard to what he said in the interview as published February 23, 1981 (Tr. 38).

The testimony of defendant James speaks for itself in regard to what defendant James anticipated was going to happen shortly after March 1, 1981, the date the State Republican Chairman would receive and transmit the "results" of the "groups" of Republican leaders throughout the State.[6] Defendant James testified as follows:

Q. In here he [Randy McConnell, the reporter for the Missouri Times] quotes you [in the February 23, 1981 newspaper article] as saying, in reference to fee agents changing hands, "They will be awarded to people who have been in the political world," James said in a Times interview. "In some traditionally Democratic counties, the Republicans constitute a hardy band that's been beaten over the head by the local establishment for years. Those people deserve to be recognized as long as they're capable of doing the work, which we will make sure they are." Did you say that?

---

**6.** The "results" of the "groups" language in the above sentence is quoted from State Chairman Powell's February 6, 1981 memorandum (Plain-

tiffs' Exh. 21). That memorandum will be later summarized in part B.5 to follow.

A. I'm quite certain I said that. I certainly subscribe to those views. (Tr. 39)

One of the unusual factual circumstances of this case is the fact that the state officer in whose name the partisan dismissals of incumbent Democratic fee agents must be made and in whose name the new Republican fee agents must be appointed, while unquestionably a "lifelong Republican" (Tr. 27, is apparently opposed to the practice of political patronage under which he is required to operate. Defendant James testified as follows on page 40 of the transcript:

Q. . . . The next sentence [in the February 23, 1981 Missouri Times article] reads: "Governor Bond attempted to change it the last time." Did you say that?

A. Yes, and that definitely refers to the method by which fee agencies are dismissed and appointed.

Q. And the reference to "last time," was that to the previous Bond administration beginning in 1973?

A. The first Bond administration, yes.

Q. And then he goes on to quote you as saying, "But the system is impervious to change, so we're determined to use it for our purposes." Did you say that?

A. Mr. McConnell and I have a slight dispute over that statement. I did say and do remember exactly the first part, but the last three words, "for our purposes," is a McConnell invention. I don't remember exactly what I said. It wasn't "for our purposes," but it was something that comports with the sense of the whole sentence.

Q. You admit then that you said this much, "But the system is impervious to change, so we're determined to use it." Is that correct? . . .

A. Yes, sir. (Tr. 40)

That testimony continued with the following on page 42 of the transcript:

Q. He goes on to say [in the February 23, 1981 Missouri Times article] that you predict a blood-letting in fee offices, . . . Did you say that?

A. I'm sure I did. It seems to be the case.

Q. And by the "blood-letting" you are referring to the replacement of fee agents appointed under Democratic governors in the Department of Revenue and their replacement with agents appointed by Governor Bond and you?

A. I'm referring to the fact that when a change is made, unfortunately it causes sometimes dislocation in people's lives, and I specifically had in mind, I think, the wife of a friend of mine in the legislature, and that whole process, including such things as fallout that results in this lawsuit is a quite uncomfortable thing, and I view it as that, and I was trying to tell him that I hoped some day we can have a better way of doing this.

Q. And is it uncomfortable because changes in fee agents must be made irrespective of your personal feelings for the agents involved, because of the politics involved?

A. It is uncomfortable because it causes dislocation in people's lives.

And on page 44 of his testimony, defendant James, after making reference to his "belief that there should be a better way of doing the whole process," testified further that:

Q. Did you go on to say [in the February 23, 1981 Missouri Times article], "This may be the last hurrah, the last spasm of pain where persons' wives are released as fee agents, and the family tries to live through a month or two of anxiety?"

A. Well, I think I did say that. I certainly hope it is the case.

Q. You hope it is the last spasm of pain?

A. I think this whole process is hypocritical and consumes a lot of people's time unnecessarily, yes, gentlemen.

Q. And you go on to say, "This may be the last time the state wants . . . to stomach it," is that correct?

A. I hope I did say that.

Defendant James gave similar testimony when he testified before Judge Wright in *Gibbons, et al. v. Bond*, 523 F.Supp. 843 (W.D.Mo.1981). See particularly pages 12 to 14 of Plaintiffs' Exhibit 23. Page 12 of the transcript of defendant James' testimony in *Gibbons* shows, for example, that Mr. Benson, counsel for the plaintiffs in both *Gibbons* and this case, asked defendant James whether he had predicted that "the blood-letting would convince the Missouri General Assembly to put the Revenue Department under the merit system by the time Bond leaves office in 1984." Defendant James answered that "I certainly hope its true."

That testimony, which may or may not reflect the present political view of Governor Bond's second administration, must be considered in light of the fact that defendants have proposed that we make a finding of fact to the effect that "During his first administration, defendant Bond attempted to place fee agencies in hands other than organizational political appointees . . ." (Paragraph 34 of defendants' proposed findings). Defendants also propose a finding that "also, during the first Bond administration, a legislative initiative was made which would have limited the role of politics in selecting fee agents, which legislative initiative was unsuccessful" (paragraph 35 of Defendants' proposed finding).

What Governor Bond may have proposed to the Missouri General Assembly during his first administration is not relevant to whether plaintiffs were dismissed solely for partisan purposes from their positions of Section 136.055 fee agents during Governor Bond's second administration. Defendants' proposed findings are rejected for the reason stated.

4. *The Political Patronage Practices Presently Followed in Regard to Section 136.055 Fee Agents May be Abolished Without Any Action on the Part of the Missouri General Assembly*

In light of the findings of fact proposed by the defendants in their paragraphs 33

and 34, it is appropriate that we note our disagreement with Judge Cahill's comment in *Sweeney* which suggested, immediately after Judge Cahill had made his "political 'plum'" finding, that:

If the Legislature believes a better approach would be to minimize this patronage, it might well enact legislation which would mandate a term concurrent with that of the Governor's, or provide only branch offices in the areas of high population (such as Moline Acres, Creve Coeur, and St. Charles), appointing fee agents in smaller or rural communities, or alternately, *careful selection of municipalities* or community organizations. (Page 130 *Sweeney*). (emphasis ours)

The record in this case, perhaps unlike the record in *Sweeney*, clearly establishes that there was never any need for Governor Bond to have sponsored a "legislative initiative" during his first administration in order to take the appointment of Section 136.-055 fee agents out of politics. Nor is there any present need during Governor Bond's second administration for the Missouri General Assembly to pass any new legislation in order to enable Governor Bond to take the appointment of Missouri fee agents out of the presently established Missouri practice of partisan political patronage.

In paragraph 8 of their stipulation in this case the parties agreed that one, but only one, of the 158 fee agent offices appointed pursuant to Section 136.055 is operated by a municipality of the State of Missouri. For reasons not established at trial, see pages 54–55 of the transcript, the municipality of Blue Springs, Missouri, was in fact appointed as a fee agent pursuant to Section 136.-055 during Governor Teasdale's administration (Tr. 48). Under such an appointment, defendant James testified that the fee authorized by Section 136.055 "goes to the general revenue of the city [which] appropriates [funds] for the agency" to operate (Tr. 48). In light of the stipulated evidence, it would appear to be doubtful that the City Council of Blue Springs would need to

make any substantial appropriation in order for that municipality to discharge the duties of a Section 136.055 fee agent and to thereby collect the net income which flows from such an appointment for use for general municipal purposes.

Although defendant James testified that the idea of appointing municipalities as Section 136.055 fee agents was "similar to the idea that Governor Bond had in his first campaign to take this out of a political porkchop operation" and although he testified that "we have continued to attempt to do that" (Tr. 48), there is no credible evidence to support a finding that the five Democratic incumbent fee agents involved in this case, or that any other incumbent Democratic fee agent, was being removed in order to permit the appointment of a municipality in the same pattern as the appointment of Blue Springs. The Blue Springs appointment is still the single exception of a selection of a municipality as a Section 136.055 fee agent.[7]

The record in this case does not show how much net income the municipality of Blue Springs receives in its capacity as "an agent of the department of revenue" appointed pursuant to Section 136.055. Nor does the record show whether the municipality of Grandview, for example, if selected as a Section 136.055 fee agent rather than the Republican selected for appointment, would be able to realize a net profit of $44,200.00, enjoyed by the incumbent Section 136.055 fee agent. (See paragraph 39 of the undisputed findings of fact, based on paragraph 11 of the stipulation). It is reasonable to infer, however, that the municipality of Blue Springs does have a net profit from its activity as a Section 136.055 fee agent and that all of the five municipalities in which the fee offices contested in this litigation would also be able to discharge the duties of a Section 136.055 fee agent in a profitable manner.[8]

The record in this case establishes that defendant James did not exercise an uncontrolled discretion to select or appoint the persons to act as agents for the department of revenue pursuant to Section 136.055. As above noted, the parties have stipulated that the recommendations of the Governor and his staff were tantamount to appointment. See paragraph 19 of the stipulation. We expressly find that both the dismissals of the incumbent Democratic fee agents and the selection and appointment of their Republican successors were carried out in the name of defendant James but in actual accord with what Governor Bond aptly described in his February 4, 1981 memorandum as the "procedures" of political patronage contained in Republican State Chairman Powell's memorandum of February 6, 1981.[9]

---

7. It is to be remembered that Section 136.055 expressly authorizes the state director of revenue to either "select" or "appoint" an agent of the department of revenue. We know of no reason why other municipalities may not be selected in the same manner as Blue Springs was selected a number of years ago.

8. The record in this case establishes that the potential net profits to be enjoyed by the municipalities of Clinton, Gladstone, Kahoka, and Savannah, respectively, assuming that those municipalities would be selected instead of the Republicans appointed by the second Bond administration, amount to $18,310.00, $36,000.00, $11,000.00 and $14,000.00, respectively. See paragraphs 40 to 43 of the undisputed findings of fact, based on paragraphs 12 to 15 of the stipulation.

The parties also stipulated and defendants proposed a finding of fact in their paragraph 44 that:

> During 1980, motor vehicle license agents made a total of four and one-half million individual business transactions with members of the public in Missouri, with the total transactions in 1981 expected to be similar in number (Stipulation paragraph 17).

That proposed finding is irrelevant to any question presented in this case except to the extent that it suggests that the Section 136.055 political pie into which politically favored Jack Horners are permitted to insert their respective thumbs to pull out their individual political plums is indeed a very large one. It also generally suggests the amount of money various municipalities would be able to earn if they, rather than some political favorites, would be selected as a Section 136.055 fee agent.

9. This case does not present the question of whether incumbent fee agents may be removed for the purpose of appointing a municipality as a Section 136.055 fee agent for the purpose of

5. *How the Patronage Procedures established by the Second Bond Administration Were Applied In Regard to Section 136.055 Fee Agents*

State Chairman Powell's February 6, 1981 memorandum (Plaintiff Exhibit 21) candidly stated that "[y]our State Chairman has been asked to assist Governor Bond and Director of Revenue James in being sure that all appropriate Party officials have an opportunity to make recommendations regarding possible changes in fee office franchises." The Republican state committee members and the Republican county chairmen were instructed in that memorandum to form "groups" composed of the County Chairman, ward and township leaders in urban areas, all Republican State Senators and Representatives, and the local Bond for Governor Coordinator. The "groups' results" were to be forwarded to Chairman Powell by March 1, 1981 at the Republican State Headquarters.[10]

Plaintiffs' Exhibit 20 is a copy of a memorandum, also dated February 6, 1981, from defendant James addressed to all Republican state committee members on the subject of "Motor Vehicle and Operators' (Fee) Offices." That memorandum advised those Republican political leaders that "[t]he Revenue Department of Missouri will be making a number of changes in the fee office franchise holders." Those political leaders were invited to make recommendations "either to me or directly to the Governor's office." [11]

---

(a) putting to an end, once and for all, to the established practice of political patronage appointments of Section 136.055 fee agents, and (b) to enable municipalities in these troubled times of budget cutting to earn money which would otherwise go to some "faithful and deserving" political appointee.

It does not take much imagination, however, to suggest that a far different case would be presented if the defendants decided to remove all incumbent Democratic fee agents for the reasons stated in this footnote.

**10.** Chairman Powell's February 6, 1981 memorandum reminded all Republican state committee members and county chairmen that "Our party and the Bond Administration stand for competence and good government, so we should make our recommendations accordingly."

President Andrew Jackson, who is generally acknowledged to have been the Father of what came to be known as the Spoils System, had the following to say in his First Inaugural Address, May 4, 1829, in regard to how the vacancies to be created by the anticipated partisan dismissals by President Andrew Jackson's first administration of appointees of President John Quincy Adams' administration were to be filled:

The recent demonstration of public sentiment inscribes on the list of Executive duties, in characters too legible to be overlooked, the task of *reform*, which will require particularly the correction of those abuses that have brought the patronage of the Federal Government into conflict with the freedom of elections, and the counteraction of those causes which have disturbed the rightful course of appointment and have placed or continued power in unfaithful or incompetent hands.

In the performance of a task thus generally delineated I shall endeavor to select men whose diligence and talents will insure in their respective stations able and faithful cooperation, depending for the advancement of the public service more on the integrity and zeal of the public officers than on their numbers. (Emphasis President Jackson's)

The following untenable argument made by defendants on page 15 of their proposed findings of fact and conclusions of law in their effort to justify their partisan dismissals of the plaintiffs in this case must be said to have a familiar ring:

These people [the plaintiffs in this case] are intense partisans who have been actively associated with partisan politics for most of their adult lives. Each and every one of them were active and visible supporters of defendant Bond's political opponent in the 1976 and 1980 gubernatorial elections. That the communities they serve are aware of their political activities is obvious. Intensively partisan Teasdale Democrats should not be frozen into positions associated by the public with the Bond administration. The present Republican administration should not be saddled with primarily Democratic representatives at the grass roots.

**11.** February 6, 1981 was a busy day for defendant James. For on that same day, defendant James sent still another memorandum to David Broeker, one of Governor Bond's assistants. That memorandum stated:

It might be a good thing to include the Wright County Fee Office (Mountain Grove) and the Scott County Office (Sikeston) in the first class of agency turnover.

It would make Representative Kelly and Senator Dennis very happy.

That memorandum is further evidence of the stipulated fact that Governor Bond and his

Plaintiffs' Exhibit 3, dated February 12, 1981, the day the luncheon was scheduled at the Governor's Mansion, is a memorandum from Joe Frappier, who had recently been appointed by defendant Bond as Director of Consumers' Affairs (Tr. 21), to David Broeker, one of Governor Bond's three assistants who had been invited to the February 12, 1981 luncheon (Tr. 29, Plaintiffs' Exhibit 1). A copy of that memorandum was also sent defendant James, who was scheduled to be present at the luncheon. The record does not show whether Plaintiffs' Exhibit 3 was actually discussed at the February 12, 1981 luncheon at the Governor's Mansion. The record does establish, however, that Plaintiffs' Exhibit 3's discussion of the anticipated dismissal of the two incumbent Democratic fee agents in St. Charles County and the factors recommended for consideration in the selection of the incumbents' successors provide a classic example of how Section 136.055 patronage plums are dispensed in Missouri politics.

Mr. Frappier, who had been a member of the State Senate from St. Charles County before his appointment to State office by Governor Bond, see Plaintiffs' Exhibit 17, was obviously familiar with the political situation in his home county. Governor Bond's assistant was advised that the "County Chairman is doing an excellent job and is making real progress toward building an effective Republican organization in this very important county." Mr. Frappier warned, however, that "a disregard of the committee's recommendations will seriously jeopardize his efforts to strengthen the party organization."

In specific regard to three persons who would be candidates for appointment to the Wentzville fee office in St. Charles County, once the Democratic incumbent was removed, the memorandum stated that the first candidate "is having a hard time financially and probably needs the money." The memorandum continued, however, that "he would really like to move the fee office to Lake St. Louis, but it would cause a great deal of furor in Wentzville if he did." The memorandum suggested that another candidate should be eliminated from consideration because he "publicly endorsed the Democratic candidate for sheriff in the November election and there would be a great deal of opposition if he was given this fee office." Mr. Frappier added that "the endorsement was a stupid mistake but it is too late to take it back."

Still another "viable candidate" was described as "a community leader, Republican, but not active in party organization." Mr. Frappier suggested that he "would probably do the best job, taking care of the public, but it would cause a furor in the regular party organization." [12]

In regard to the St. Charles fee office, the memorandum passed on the information that the County Chairman would oppose one candidate because her appointment "would cause civil war in the party." He added that "the party regulars simply feel that [the candidate] has not paid her dues in an amount sufficient to justify receipt of this *super* plum." [13] (emphasis ours)

Another candidate for the St. Charles appointment was recognized to have been "an active Republican for many years, a very personable lady who would do an excellent job of running the fee office" but the memorandum reported that the County

---

staff were in actual political control of the "agency turnover" rather than defendant James, as the Director of the Department of Revenue, as provided in Section 136.055.

**12.** The recommendation that the candidate who "would probably do the best job" should not be considered for appointment would seem to be a bit at odds with the reminder in State Chairman Powell's February 6, 1981 memorandum to Republican political leaders throughout the State that "Our Party and the Bond Administration stand for competence and good govern-

ment, so we should make our recommendations accordingly.

**13.** We have indicated above our agreement with Judge Cahill's "political 'plum'" finding made in *Sweeney*. The *Sweeney* opinion shows that the St. Charles fee agent office was in litigation in that case. The record in this case, however, does not show why the St. Charles fee agent office should be considered a political "super plum," rather than a simple garden variety political "plum," as found by Judge Cahill.

Chairman was reluctant "to give the job to her because she did not work for Kit and may have been a Phelps supporter."[14] Mr. Frappier appended a long hand note to his memorandum to Governor Bond's assistant to "please hurry because Riddler [the incumbent Democratic fee agent] is using the St. Charles revenue to support numerous city council races."

Plaintiffs' Exhibit 17, a copy of a memorandum dated March 10, 1981 from Governor Bond to members of his staff and to defendant James shows that the difficulties involved in selecting a politically acceptable person to succeed the incumbent Democratic fee agents in St. Charles County had not been solved as fast as Governor Bond desired. Governor Bond's March 10, 1981 memorandum to his staff members and to defendant James stated that:

> It was the very strong opinion of our political friends in St. Charles that we move immediately if not sooner to get rid of fee agent Rory Riddler in St. Charles city who has been bankrolling Democratic candidates including Fred Dyer's opponent. Can this be accomplished prior to the March 17 election?[15] (Plaintiffs' Exh. 17)

Defendant James' memorandum of March 11, 1981 to Governor Bond's assistant Broeker in regard to the "St. Charles Fee Office" (Plaintiffs' Exhibit 18), was short and to the point. He reported the day after

he received Governor Bond's memorandum that:

> We *need* to do St. Charles. I have discharged the incumbent.

Defendants argue that evidence concerning the "removal of any agent in St. Charles has no relevance or materiality whatsoever to the five fee agents who are plaintiffs in this case." See answers of defendants Bond and James to plaintiffs' proposed findings of fact and conclusions of law, p. 3. Defendants also argue that the "termination of a Democratic fee agent in St. Charles, who was terminated because he was using his fee agency office as headquarters for Democratic campaigns in 1981, bears no relationship whatsoever to the general statement that a 'mechanism' was used to select Republicans as successors." Ibid. p. 3.

Defendants' arguments are untenable in light of all the facts and circumstances of this case. The record in this case shows that the members of the Governor's staff and Governor Bond himself closely followed the political action in regard to all appointments of Republican fee agents to succeed incumbent Democratic fee agents in substantially the same manner as has been detailed in regard to the St. Charles fee agent office. Plaintiffs' Exhibit 22, for example, is a memorandum from one of Governor Bond's assistants to defendant James

---

14. "Kit" was an obvious reference to Governor Bond. "Phelps" was an obvious reference to Governor Bond's opponent in the 1980 Republican primary election.

Mr. Frappier's memorandum further advised Governor Bond's assistant that it was his "sad duty to inform you that you may receive in the very near future a letter from one Joyce Frappier, urging that she be considered as operator of the St. Charles" fee office. Mr. Frappier added, apparently on behalf of his wife, see Official Manual, State of Missouri, p. 87, that "she is serious and will give you a very strong argument that she has sacrificed for the party for 20 years and never received a thing but loneliness."

15. Plaintiffs' Exhibit 17 shows that Governor Bond also suggested in his March 10 memorandum that if the procedures contained in Republican State Chairman Powell's February 6, 1981 memorandum (Plaintiffs' Exhibit 21) had not

been followed, that a group meeting might be convened in order to find a politically acceptable appointee. The last paragraph of defendant Bond's March 10, 1981 memorandum stated:

> Don Helsly who provided an airplane for us and has been a generous contributor in a number of things said that he wanted a fee office but he understood that somebody else had already been recommended. Again, we should run this by our local people but if they did not have the meeting of local representatives, senator (for which Frappier would still qualify) county chairman and Bond coordinator, they might want to consider Helsly again. Helsly said that maybe he could help the state because he is a heating and air conditioning contractor who specializes in conservation work. If we need that kind of assistance, he certainly should be considered on the basis of the services he can provide.

dated February 18, 1981 in regard to whom ought to be appointed to the Pettis County fee agent office. That memorandum reported the "results" of the meeting of the Pettis County Republican "group" but also stated the clear preference of the Governor's office in regard to who should be appointed. Plaintiffs' Exhibit 22 stated in that regard:

> Clearly, the individual that contributed the most from Pettis County in terms of time *and* money was [one of our coordinators. He] was not the type of guy who showed up at every dinner or meeting. I know, however, that he was a strong supporter who worked very hard on the various campaign projects—yard signs, telephone identification, and literature distribution.... I suppose my preference is clear. I developed a good working relationship with [our coordinator] during the campaign and know that he was clearly our hardest and most effective worker in Pettis County. I strongly support the candidacy of his wife and would urge each of you to do the same. I put this particular matter in writing for fear it may slip through the cracks at some point.

Plaintiffs' Exhibit 5, dated February 20, 1981, is a memorandum from Governor Bond to members of his staff concerning the Gladstone fee agent office, one of the five Section 136.055 fee agent offices directly involved in this case. Governor Bond's February 20, 1981 memorandum reflects Governor Bond's personal political concern and firm disapproval of any notion that a Democrat should receive an appointment to "a most lucrative fee office" in Clay County. Plaintiffs' Exhibit 5 stated in part:

> In talking with our friends at lunch on Friday north of the River I found a very great resentment at the thought of giving a most lucrative fee office to a Democrat in Clay County. John Ferguson, Mary Alice Doberstine predicted open revolt among the Republican party.... The fee office gross is $90000 and nets about $40000 for the operator.

Plaintiffs' Exhibits 7, 8, 9, 10, 11, 12, 13 and 15 are copies of correspondence and memoranda between defendant James and the Executive Vice Chairman of the Missouri Republican Party which establishes the manner in which the procedures outlined in State Chairman Powell's February 6, 1981 memorandum were implemented. Defendants' argue that "[t]here is no indication whatsoever in any evidence before this Court that any 'mechanism' was used to select 'loyal Republicans' as successor fee agents." See answers of defendants Bond and James to plaintiffs' proposed findings of fact and conclusions of law, p. 3. That argument is untenable in light of the deposition testimony set forth in the footnote below.[16]

Judge Cahill found that "the evidence [in *Sweeney*] was replete with recommendations to Governor Bond by Republican leaders suggesting replacement for the Democratic incumbents." (*Sweeney*, p. 130).

---

16. Defendants also complain about plaintiffs' use of the word "mechanism" in connection with their assertion that "there is no evidence indication whatsoever in any evidence before this Court that any 'mechanism' was used to select 'loyal Republicans' as successor fee agents." Defendants' complaints on both scores are untenable for the reason that Plaintiffs' Exhibit 25 shows that defendant James testified as follows on page 13 of his deposition which was offered and received in evidence as an admission:

Q. In general, was a *mechanism* established by which potential Fee Agents, or the entity of Fee Agents were solicited?
A. Solicited—well, yes, *we did have a mechanism* for screening, or reviewing, or evaluating. I hesitate to use the word solicit.

\*　\*　\*　\*　\*　\*

Q. How does this *mechanism* work?
A. We asked the State Chairman of the Republican Party to notify the County Chairmen that their advice was welcome. I went to the caucus leaders of the two caucuses in the Legislature and made it clear that agencies in their districts could be commented on by them, and encouraged them to get their views into files. And then the campaign group affiliated with the Governor's particular campaign made sure that the county coordinators of the respective counties knew that their advice was more than welcome—was solicited. We wanted to know what they thought. (emphasis ours)

The exhibits we have discussed in detail, when considered in light of plaintiffs' Exhibits 7 to 13, inclusive, and Plaintiffs' Exhibit 15, and the testimony at trial require and support a similar finding in this case.

We are therefore satisfied that plaintiffs' proposed findings of fact in regard to the areas of factual dispute under discussion are supported by the weight of the credible evidence and that those findings should be made as proposed. We further expressly find that defendants' proposed findings of fact in the area under discussion are not supported by the credible evidence and should therefore be rejected. In the next part of our findings we will make appropriate findings in regard to plaintiff Joseph.

### 6. Plaintiff Joseph Was Not Terminated For Cause

Paragraph 20 of the stipulation reads as follows:

The defendants have not, and do not, maintain that plaintiffs Finks, Small, Glover and Ferguson were dismissed by reason of their misfeasance or malfeasance of agency. Mr. James had neither met nor spoken with those plaintiffs prior to terminating them and terminated them because their prior political activities did not demonstrate the dependability and allegiance he deemed necessary for continued service as fee agents. *If he were to testify, however, Mr. James would state that plaintiff Joseph would have been terminated for cause quite apart from any political considerations whatsoever.* (emphasis ours)

The substance of the first two sentences of paragraph 20 of the stipulation is the subject of the findings made in paragraphs 53 and 54 of the undisputed findings of fact. Paragraph 55 of defendants' proposed findings of fact, however, would have the Court make a finding based solely on the last sentence of paragraph 20 of the stipulation, which stated that "[i]f he [defendant James] were to testify, [he] would state that plaintiff Joseph would have been terminated for cause quite apart from any political considerations whatsoever." Specifically, paragraph 55 of defendants' proposed findings of fact would have the Court find that "plaintiff Joseph, on the other hand, would have been terminated from her fee agency for cause quite apart from any political considerations whatsoever."

Plaintiffs' proposed findings of fact in regard to plaintiff Joseph are, of course, directly to the contrary to those proposed by defendants. Plaintiffs' proposed finding 23, for example, stated that "[t]here is no evidence that Plaintiff Joseph's fee agent appointment was terminated for cause."

Defendants recognize on page 6 of their reply to plaintiffs' answers to defendants' proposed findings of fact and conclusions of law that "[t]here is no evidence in the record, which relates to the reasons for defendant James' determination to terminate plaintiff Joseph, except for the *direct statement* of defendant James that she was dismissed for cause apart from any political considerations." [17] (emphasis ours)

Defendants also argue that the burden is on the plaintiffs "to prove that a termination was solely because of the person's political affiliation or beliefs" and that plaintiffs have failed to carry their burden of proof. We disagree with defendants' argument that plaintiffs failed to carry the burden of proof.

Defendants' arguments in regard to reasons for plaintiff Joseph's dismissal are quite comparable to their arguments in support of paragraph 52 of their proposed findings of fact. Defendants proposed in their paragraph 52 that the Court find that "[f]ee agents must have partisan political allegiance in order to properly and loyally per-

---

17. The "direct statement" of defendant James is that contained in paragraph 20 of the stipulation which was the single citation to the record made by defendants to support their proposed finding 55.

No other portion of the record could be cited because defendant James was not asked any questions concerning plaintiff Joseph when he was on the witness stand.

Defendants added to their citation of paragraph 20 of that stipulation their legal argument that "plaintiffs did not offer evidence sufficient to prove, or even to rebut, the statement of Mr. James to that effect."

form their functions as representatives of the administration." That proposed finding, like defendants' proposed finding 54, was based solely on a citation to that portion of paragraph 19 of the stipulation which stated "Defendant James, if he were to testify, would state his *belief* in the general proposition that fee agents must have political allegiance in order to properly and loyally perform their functions as representatives of the administration, and that he has been guided by that proposition in making most of the appointments of fee agents." [18] (emphasis ours)

Defendants attempt to base still another of their proposed findings of fact on a stipulated "belief" of the defendants. Paragraph 45 of defendants' proposed findings of fact stated that "[t]he manner in which these millions of transactions [made by Section 136.055 fee agents with members of the public in Missouri] are conducted, including the efficiency, cordiality, and administration loyalty exhibited by the fee agents and their employees, reflects upon the State of Missouri, the Department of Revenue, and the incumbent administration." That proposed finding was based on a sentence in paragraph 17 of the stipulation which stated that both *"[d]efendants believe* that the manner in which these transactions are conducted, including the efficiency, cordiality, and administration loyalty exhibited by fee agents and their employees, reflects upon the State of Missouri, the Department of Revenue, and the incumbent administration." As was true in connection with their other proposed findings based on defendants' "beliefs," defendants argue that "[p]laintiffs offered no evidence whatsoever to rebut this stated *belief* of the defendants." (Emphasis ours)

It was not incumbent upon the plaintiffs to offer any evidence to rebut defendants' stipulated but irrelevant belief that the manner in which a government agent appointed under Section 136.055 displays his administration loyalty and the manner in which he performs the duties imposed on him by law somehow reflects upon "the incumbent administration." Such a belief is obviously based on the untenable notion that Section 136.055 designated a member of a partisan political party as the person "to act as an agent of the department of revenue [in connection with] the sale of motor vehicle licenses and the collection of motor vehicle sales and use taxes." Persons appointed as part time agents of the Missouri department of revenue pursuant to Section 136.055 to collect taxes stand in no substantially different position than other agents of that department who are appointed to serve as full time employees of that department for the purpose of collecting taxes authorized by law. In short, under the law there are no Republican tax collectors and there are no Democratic tax collectors; there are only persons authorized by law to collect taxes in accordance with law. And should those persons display inefficiency or a lack of cordiality to the public of Missouri in regard to the manner in which they discharge their lawful duties, there is no question but that they may be removed for cause.

Both *Branti* and *Elrod* state the reasons why government agents appointed to collect taxes may not be dismissed solely for a failure to display "loyalty" to the political views of an incumbent administration. *Branti v. Finkel,* 445 U.S. 507 at 517, 100 S.Ct. 1287 at 1294, 63 L.Ed.2d 574 (1980), held that "[t]o prevail in this type of action, it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged 'solely for the reason that they were not affiliated with or sponsored by the Democratic Party.'" 427 U.S. at 350 [96 S.Ct. at 2678]." *Branti* stated in footnote 12, page 517, 100 S.Ct. page 1294 fn. 12 its agreement with the plurality opinion in *Elrod* which "emphasized that patronage dismissals could be justified only if they advanced a governmental, rather than a partisan, in-

---

**18.** In a manner similar to their effort to support paragraph 55 of their proposed findings of fact, defendants argue in regard to paragraph 52 of their proposed findings that defendant James "belief" should be converted into a finding of fact because "plaintiffs have offered no evidence whatsoever to rebut this stipulated belief of defendant James."

terest. 427 U.S. at 362 [96 S.Ct. at 2684]." *Branti* added that "[t]he compensation of government employees, *like the distribution of other public benefits,* must be justified by a governmental purpose." 445 U.S. at 517, fn. 12, 100 S.Ct. at 1294, fn. 12. (emphasis ours).

*Elrod* recognized, of course, that "employees may always be discharged for good cause, such as insubordination or poor job performance, *when those bases in fact exist.*" 427 U.S., at 366, 96 S.Ct., at 2686 (emphasis ours). We find that there is no credible evidence that could be said to establish a factual basis to support a finding that plaintiff Joseph was, in fact, or could have been, in fact, dismissed for cause.[19] Indeed, when defendant James advised her in his letter to her dated May 29, 1981 (Plaintiffs' Exhibit 14) that "Your appointment as an independent fee agent of the Department of Revenue by the former Director of Revenue will terminate as of the close of business on June 20, 1981," he closed that letter with the statement that "[y]our service to the department is appreciated." Thanking one for their services to the department is hardly consistent with the notion that the person terminated was or could have been discharged for cause.

The evidence in this case requires and supports our finding that all five plaintiffs, including plaintiff Joseph, were discharged as § 136.055 fee agents solely for the reason they were not affiliated with or sponsored by the Republican Party. The stipulated fact that defendant James may have a belief, which may be assumed to be a sincere belief, that Section 136.055 fee agents in the second Bond administration must have partisan political allegiance to the Republican Party in order to properly and loyally perform their functions as a Section 136.055 fee agent and an equally sincere belief that he might have been able to find some basis in fact for terminating plaintiff Joseph for cause do not support defendants' proposed findings that the patronage dismissals of the plaintiffs, including but not limited to plaintiff Joseph, were justified under the law applicable to this case.[20]

---

19. Defendants did not call any witnesses; nor did defendants offer any exhibits in evidence. Defendant James, called as a witness by plaintiffs, was asked only two questions on cross-examination and was then excused.

Defense counsel made an ineffective effort to establish some sort of cause for plaintiff Joseph's termination during the cross-examination of witness Thaier (Tr. 60). That cross-examination established, however, only that there was an alleged theft of an extraordinary amount of money from the Grandview fee agent's office (Tr. 62) and that there was a single complaint about a photovision tester which may or may not have been well founded (Tr. 64). Redirect examination established that the $30,000 theft was not "an internal theft or anything like that" but that an employee of the fee agent, "on his way to the bank," was a victim of a strong arm robbery at gunpoint (Tr. 65). On recross-examination, counsel for the defendants attempted, somewhat lamely, to establish that "the courier of that money was not accompanied by a police officer or other type of security protection." (Tr. 67) The witness did not have any knowledge in regard to that subject.

20. *Elrod* expressly rejected a justification argument based on the notion "that employees of political persuasions not the same as that of the party in control of public office will not have the same incentive to work effectively and may even be motivated to subvert the incumbent administration's efforts to govern effectively." 427 U.S., at 364, 96 S.Ct., at 2684. *Elrod* also expressly rejected a justification argument premised on the idea that patronage dismissals may be justified by "the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate."

We are satisfied for reasons stated in our conclusions of law that the principles of constitutional law enunciated in a case involving full time, nonpolicy-making, nonconfidential government employees are applicable and must be applied to a case involving persons appointed as part-time government agents to discharge nonpolicy-making and nonconfidential duties for the lucrative fees as authorized by Section 136.055.

It must, of course, be recognized, as was held in *Branti*, that "the ultimate inquiry is not whether the label 'policy maker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S., at 518, 100 S.Ct., at 1295.

Defendants' arguments in support of their proposed findings of fact under discussion in regard to plaintiff Joseph are based on the notion that plaintiffs have somehow failed to carry the burden of proof. *Branti* makes clear that under the factual circumstances of this case, most of which was stipulated, the burden rested upon the defendants to go forward with the evidence if defendants expected to establish an appropriate justification for the partisan political dismissals involved in this case. *Branti* concluded "if the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes." (445 U.S., at 515, 100 S.Ct., at 1293).

We are satisfied that the First Amendment protects a Missouri government agent appointed pursuant to Section 136.055 from partisan discharge based on what he believes. *Branti*, consistent with the rationale earlier stated in *Elrod*, 427 U.S. at 362 and 368, 96 S.Ct. at 2684 and 2687, added that "under this line of analysis, unless the government can demonstrate 'an over riding interest,' 427 U.S. at 368 [96 S.Ct. at 2687], 'of vital importance,' *id.*, at 362 [96 S.Ct., at 2684], requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued public employment." (445 U.S. 515–16, 100 S.Ct. 1293).

We find and conclude that the defendants have not demonstrated any interest legally sufficient to justify their partisan dismiss-

We expressly find that defendants have not demonstrated that affiliation with a particular political party is an appropriate requirement for the duties which a Section 136.055 fee agent is authorized to perform. Indeed, the parties have stipulated that "[t]here is no Department of Revenue requirement that the fee agents actually work at all in their agencies." Paragraph 10 of the stipulation. It is thus clear that fee agents, or the persons they hire to do the work, simply collect motor vehicle sales and use taxes and sell licenses for motor vehicles and various sorts of drivers licenses for the State of Missouri and collect such "additional fees" for themselves to compensate them for the services rendered.

als of the five Section 136.055 fee agents involved in this case. On the contrary, we expressly find that all five plaintiffs were in fact dismissed on the sole basis of their belief in the political party of their choice. Defendants' proposed findings of fact in regard to plaintiff Joseph are therefore rejected. Plaintiffs' proposed findings of fact in this area are accordingly adopted as additional findings of the Court.

### III. *Conclusions of Law*

#### A.

The basic legal question presented is whether the principles of constitutional law and the rationale articulated by the Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), are to be applied to the factual circumstances of this case. Defendants, in paragraph 1 of their proposed conclusions of law, suggest that this Court conclude that *Elrod* and *Burns* "have no applicability to motor vehicle license agents generally or to the specific plaintiffs in this case because those cases are concerned only with the termination of public employees solely by reason of their political affiliation."

In paragraph 6 of their proposed conclusions of law defendants direct our attention to *Sweeney v. Bond*, 519 F.Supp. 124, Eastern District of Missouri, 1981, in which Judge Cahill of the Eastern District of Missouri stated in paragraph 5 of his conclusions of law that:

We agree with the following statement in the Comment: *Patronage Dismissals: Constitutional Limits and Political Justification*, 41 U.Chi.L.Rev. 297 at 319 (1974):

Few people would question, for example, a governor's right to pick the members of his cabinet using political affiliation as an important criterion. Criteria such as political philosophy and party loyalty do not seem pertinent, however, for filling the positions of elevator operator, file clerk, janitor, or *driver's license examiner*. It is doubtful whether any political opinion of the individuals holding such jobs could interfere with the efficiency of the public service, because such employees can always be discharged for good cause. (emphasis ours)

Since fee agents are not state employees, they are not protected from dismissal because of their political affiliations. The protections of *Elrod* and *Branti* were expressly limited to state employees and their narrow holdings do not protect plaintiffs herein. Accordingly, the Court holds that since fee agents are not state employees, their appointments may be properly terminated because of their political affiliation.[21]

Defendants' almost total reliance upon *Sweeney v. Bond* is illustrated by the fact that defendants propose, with some significant exceptions, that this Court adopt almost all of the last five pages of Judge Cahill's conclusions of law in *Sweeney v. Bond* as its conclusions of law in this case.[22]

21. Our attention has also been directed to Judge Nangle's recent opinion in *Fox & Company v. Schoemehl, et al.*, 519 F.Supp. 849, Eastern District of Missouri, 1981. Judge Nangle, like Judge Cahill of the same Court, concluded that "the Court intended to limit its holdings in *Elrod* and *Branti* to the validity of the dismissal of public employees for partisan reasons." In a later part of that opinion, Judge Nangle made reference to *Sweeney v. Bond*, and noted that Judge Cahill had concluded in that case that "the Supreme Court expressly limited those holdings [referring to *Elrod* and *Branti*] to partisan dismissals of state employees and therefore refused to extend this protection to public contractors."

Judge Nangle, in the final paragraph of his opinion in *Fox & Company*, also concluded that the "final reason [why] this Court must find that the discharge of plaintiffs did not violate the First and Fourteenth Amendments is that a holding to the contrary would fail to recognize the traditional benefits accorded to this country by the patronage system." Judge Nangle quoted extensively from Mr. Justice Powell's dissenting opinion in *Branti* to support that conclusion.

We are satisfied that many persons, including but not limited to lower court federal judges, may agree with Mr. Justice Powell's view of the general practice of political patronage as an established American institution as expressed in his dissenting opinions in *Elrod* and *Branti*. We are also satisfied, however, that a lower federal judge's personal view of the patronage system, regardless of what that view may be, is not a factor that may properly be considered in deciding a First Amendment case involving one form of the general practice of political patronage.

While we are not in agreement with any number of things stated in Judge Aldisert's concurring opinion in *Loughney v. Hickey*, 635 F.2d 1063, 1065 (3rd Cir. 1980), we are in complete agreement, as we believe we must be, see *United States v. Travelers Indemnity Company*, 215 F.Supp. 455 at 460 to 464 (W.D.Mo.1963), with that portion of the opening paragraph of that concurring opinion which stated:

I concur in the result reached by this court because the essence of the common law tradition, unlike the civil law, is that lower courts follow the decisions of higher courts in the same judicial hierarchy. . . . I agree with the judgment because my loyalty to the doctrine of *stare decisis* commands that I follow the decisions of the Supreme Court of the United States.

Judge Aldisert registered his "vehement disagreement with the result and the reasoning" of both *Elrod* and *Burns*, which he described as the "Son of *Elrod*," 635 F.2d at 1065, and stated his enthusiastic agreement with Mr. Justice Powell's view that "there is a need to preserve the patronage system at all levels of government." *Id.* at 1071.

It is our view that all lower federal court judges must follow and apply *Elrod* and *Burns* regardless of whether they may be in agreement with either the result or the reasoning of those cases.

We do not read *Elrod* and *Branti* as those cases have been read by our Eastern Missouri brethren for the reasons we shall state in the text. Under our reading of those cases and under our duty to follow the decisions of the Supreme Court, we conclude that plaintiffs are entitled to equitable relief under the circumstances of this case.

22. Although defendants suggest that "identical factual and legal issues" are presented in *Sweeney v. Bond* and this case, they do not propose that this Court adopt any portion of paragraphs 7, 8, and 9 of Judge Cahill's conclusions of law in *Sweeney v. Bond*, which stated in part that:

7. There is no serious contention by either party that the fee agents hold policymaking jobs, for they exercise little discretionary responsibility and have no supervisory function over any but their own employees. . . .

8. Obviously, too, none of the fee agents now hold, nor would any of the Bond appointees hold, any confidential relationship to the Director of Revenue because of their fee agent status. In fact, they are hardly known to the Governor or his staff, but clearly are the selected choices of political leaders throughout the state who wish to reward party loyalty with a patronage "plum."

9. It is apparent to this Court that partisan political affiliation played a substantial role in all of the dismissals. The evidence was replete with recommendations to Governor Bond by Republican leaders suggesting replacements for the Democratic incumbents.

We do not agree with Judge Cahill's conclusion that "the protections of *Elrod* and *Branti* were expressly limited to state employees and their narrow holdings do not protect plaintiffs herein." Nor do we agree with the other conclusions of law made in *Sweeney v. Bond* which defendants present to this Court as proposed conclusions of law to be made in this case for the reasons we shall state in detail.

### B.

When *Elrod* and *Branti* are viewed in perspective, it becomes apparent that the considerable early effort by the Supreme Court to avoid consideration of the constitutional implications of political patronage practice would eventually prove to be unsuccessful. Approximately thirty years ago, the Court of Appeals for the District of Columbia in *Bailey v. Richardson,* 86 U.S. App.D.C. 248, 182 F.2d 46 (1950), affirmed per curiam by an equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1950), summarily brushed aside an appellant's effort to obtain consideration of the First Amendment question presented in a political patronage case. The *Bailey* court stated that "the plain hard fact is that so far as the Constitution is concerned there is no prohibition against the dismissal of Government employees because of their political beliefs, activities, or affiliations."

In 1971, twenty years after *Bailey v. Richardson* was decided, the Second Circuit noted in its per curiam opinion in *Alomar v.*

*Dwyer,* 447 F.2d 482 (2d Cir. 1971), *cert. denied* 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972), that "[t]he spoils system has been entrenched in American history for almost two hundred years." *Id.* 483. The Second Circuit affirmed the district court's dismissal of the plaintiff's First Amendment claim in *Alomar* from the bench at the time of oral argument on the theory that "[t]he *Bailey* court teaches that the sole protection for government employees who have been dismissed for political reasons must be found in civil service statutes or regulations." *Id.* 483. The Second Circuit concluded that "it is well understood that the victors will reap the harvest of those public positions still exempt from such laws." *Id.* 483.

The Seventh Circuit's 1975 opinion in *Burns v. Elrod,* 509 F.2d 1133, 1356 (7 Cir. 1975), *aff'd* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), shows that in *Burns* the district court had relied upon the Second Circuit's decision in *Alomar* to support its dismissal of plaintiffs' First Amendment claim. The Seventh Circuit's short opinion reversing the district court's dismissal, as was later noted by the Supreme Court in its opinion in *Elrod,* 427 U.S. at 350, 96 S.Ct. at 2678, was based solely upon the Seventh Circuit's 1972 decision in *Illinois State Employees Union v. Lewis,* 473 F.2d 561 (7th Cir. 1972), *cert. denied,* 410 U.S. 943, 93 S.Ct. 1370, 35 L.Ed.2d 609 (1973). *Lewis* was decided by the Seventh Circuit after the *Elrod* district court had relied upon the

Defendant James testified that he believed fee agents must have partisan political allegiance in order to properly and loyally perform their functions; he indicated that recommendations by the Governor and his staff would be tantamount to appointment.... [emphasis ours]

Defendants substantially modified paragraph 9 of Judge Cahill's conclusions of law when they submitted their proposed paragraph 13 to this Court. Paragraph 13 proposed by defendants in this case stated in part the following:

13. It is apparent to this Court that partisan political affiliation played a substantial role in all of the dismissals. *The Court does not find, however, that politics was the sole reason for these terminations.* The evidence was replete with recommendations to Governor Bond by Republican leaders suggesting

replacements for the Democratic incumbents although Democratic leaders and others also made recommendations. *These recommendations did not always, however, result in appointment of the recommended Republicans.* [Emphasis ours]

Defendants obviously inserted the first italicized sentence in proposed paragraph 13 in an effort to negate any inference that Judge Cahill implicitly found that politics was indeed the sole reason for the terminations of the five fee agents involved in *Sweeney v. Bond.* And the second italicized sentence was added in proposed paragraph 13 in this Court in an effort to lend support to defendants' factual contentions as presented in defendants' proposed findings of fact. We rejected a number of defendants' proposed findings of fact for reasons which have been fully stated above.

Second Circuit's opinion in *Alomar* to support its dismissal of the plaintiff's First Amendment claim. The district court was reversed in *Elrod* because it failed to anticipate the Seventh Circuit's later decision in *Lewis*.

It is therefore apparent that the most significant political patronage decision which established a conflict among the Circuits was that written by Judge, now Justice, Stevens in *Lewis*.[23] *Lewis* expressly rejected the rationale of *Alomar*, which was, in turn, based on *Bailey v. Richardson* and *Adler v. Board of Education*, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952).

*Lewis* concluded, we believe properly, that the line of cases illustrated by *Bailey* and *Adler* was based on the now rejected notion that because "a public employee has no constitutional right to his job, there can be no valid constitutional objection to his summary removal." 473 F.2d at 568. Constitutional rights no longer turn upon whether a particular "governmental benefit is characterized as a 'right' or as a 'privilege.'" *Graham v. Richardson*, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534.[24] The Seventh Circuit in *Lewis*, at 473 F.2d at 571, and later the Supreme Court in *Elrod*, 427 U.S. at 360, 96 S.Ct. at 2683, and

**23.** Although the Second Circuit's 1971 opinion in *Alomar* and the Seventh Circuit's 1972 opinion in *Lewis* were in obvious conflict, the Supreme Court nevertheless denied *certiorari* in *Lewis* in 1973. That fact was noted at the outset of the Comment, *Patronage Dismissals: Constitutional Limits and Political Justification*, 41 U.Chi.L.Rev. 297 (1974), a comprehensive commentary cited with approval by both the Seventh Circuit in *Elrod*, 509 F.2d at 1135, and by the Supreme Court in the same case. 427 U.S. at 355, fn. 9, 96 S.Ct. at 2680, fn. 9.

That Comment, after noting numerous Supreme Court cases which had not been considered by the Second Circuit when it rendered its decision in *Alomar*, namely, *Morrisey v. Brewer*, 408 U.S. 471, 493, 92 S.Ct. 2593, 2606, 33 L.Ed.2d 484 (1972); *Graham v. Richardson*, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971); *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970); *Shapiro v. Thompson*, 394 U.S. 618, 627 n.6, 89 S.Ct. 1322, 1327 n.6, 22 L.Ed.2d 600 (1969); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963), stated that:

Despite the recent development of constitutional doctrine narrowing the scope of permissible governmental discretion over the distribution of public benefits, the Supreme Court has twice refused to review the constitutionality of patronage dismissals [referring to *Alomar* and *Lewis*]. Nevertheless, because of the confused and conflicting decisions in the lower courts, and the serious constitutional issues raised by this form of public personnel administration, authoritative resolution cannot be indefinitely postponed.

When the Seventh Circuit expressly refused to accept the defendants' argument in *Elrod* that *Lewis* was wrongly decided and should be reconsidered, see 509 F.2d at 1135, it became apparent that the conflict between the Second,

and Seventh Circuits, reflected by *Alomar* and *Lewis*, respectively, was not going to go away and the Supreme Court granted *certiorari* in *Elrod* in order that the conflict would be authoritatively resolved.

The Supreme Court, of course, concluded that the Seventh Circuit's decision in *Lewis*, which had been expressly reaffirmed and followed in *Elrod*, was right and that the Second Circuit's decision in *Alomar* was wrong.

**24.** *Lewis* stated the following in regard to *Bailey v. Richardson* and *Alomar* in 473 F.2d at 568, fn.16:

The invalidity of the premise underlying [the holding in *Bailey v. Richardson*] was described by the Supreme Court only a few weeks ago:

In a leading case decided many years ago, the Court of Appeals for the District of Columbia Circuit held that public employment in general was a "privilege," not a "right," and that procedural due process guarantees therefore were inapplicable. *Bailey v. Richardson*, [D.C.Cir.] 182 F.2d 46, *aff'd.* by an equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352. *The basis of this holding has been thoroughly undermined in the ensuing years.* For, as Mr. Justice Blackmun wrote for the Court only last year, "this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a "right" or as a "privilege." *Graham v. Richardson*, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534; . . .

The significance of the demise of *Bailey v. Richardson* is especially noteworthy in view of the Second Circuit's reliance, in its per curiam opinion in *Alomar v. Dwyer*, 447 F.2d 482, 483 (2nd Cir. 1971), *cert.* denied, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667, on the same language from the *Bailey* opinion that defendant has quoted to us. [473 F.2d at 569] [emphasis ours]

in *Branti,* 445 U.S. at 514, 100 S.Ct. at 1292, placed great reliance upon the rationale and holding in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). The Supreme Court emphasized in that case that "[f]or at least a quarter century, this Court has made clear that even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely."

*Perry v. Sindermann* made clear that while the constitutional principle stated and applied in that case has most frequently been applied "to denials of public employment," see cases cited 408 U.S. at 597, 92 S.Ct. at 2697, the same constitutional principle is equally applicable and must be applied "to denials of tax exemptions," *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958), to "unemployment benefits," *Sherbert v. Verner,* 374 U.S. 398, 404–405, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963), and to "welfare payments," *Shapiro v. Thompson,* 394 U.S. 618, 627 fn.6, 89 S.Ct. 1322, 1327 fn. 6, 22 L.Ed.2d 600 (1969).

It is thus clear that the rationale and holding of *Lewis,* affirmed and adopted by the Supreme Court in both *Elrod* and *Branti,* was based on the very broad constitutional principle that a wide variety of valuable government benefits, including but certainly not limited to the benefit of public employment, may not be denied for constitutionally impermissible reasons. Although, *Lewis, Elrod* and *Branti,* on their respective facts, did involve cases of dismissals from public employment, there is no suggestion whatever in any of those opinions that the holdings of those cases are to be confined to such a limited factual situation.

## C.

Both *Elrod* and *Branti* were careful to emphasize that the partisan dismissals of the plaintiffs in those cases reflected but one form of the general practice of political patronage. *Elrod* specifically noted that "the Cook County Sheriff's practice of dismissing employees on a partisan basis is but one form of the general practice of political patronage." [25]

*Elrod* further noted that "[t]he practice also includes placing loyal supporters in government jobs that may or may not have been made available by political discharges" and that "[n]on-officeholders may be the beneficiaries of lucrative government contracts." 427 U.S. at 353, 96 S.Ct. at 2679.

We do not believe that *Elrod*'s statement that "although political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing public employees for partisan reasons," was in any way intended to suggest that the principles of constitutional law stated and applied in that case were to be limited only to cases which involve the form of political patronage reflected by dismissals of full time public employees solely for partisan reasons.

**25.** Pages 5–6 of M. Tolchin & S. Tolchin, *"To the Victor ..."* (1971), were cited in fn.2 on page 353 to support the above quoted statement. The Tolchin authors there stated:

> Once thought of as consisting only of jobs, patronage includes the vast range of favors awarded by constantly expanding governments whose increased government spending—much of it discretionary—has brought increased opportunities to political supporters. Non-officeholders receive construction contracts, defense contracts, banking and insurance funds, and specialized treatment by the discretionary agencies of government whose power continues to grow. Officehold-

> ers, in charge of the machinery of government, have more discretionary power to dispense. In addition to bringing home the dams, post-office buildings, military installations, and Model Cities programs that make them look good to constituents, they control the key committee assignments and judicial patronage that smooth their political futures. All these favors cement a politician's loyalty to his party leaders, to whom he is indebted for past favors and from whom he seeks future favors, while at the same time they help him earn the loyalty of those beneath him in the party structure who are in turn indebted to him for favors.

■ Indeed, we believe that *Elrod* intended to send the message to all lower courts, both State and federal, that *all* forms of the practice of political patronage must be subjected to the same constitutional analysis as that applicable to partisan dismissals of full time public employees. *Branti* made clear that both the payment of government employees and the awarding of lucrative government contracts must be considered governmental benefits and accordingly neither can be rewarded or withheld for constitutionally impermissible reasons. *Branti* held that:

> Government funds, which are collected from taxpayers of all parties on a nonpolitical basis cannot be expended for the benefit of one political party simply because that party has control of the government. The compensation of government employees, *like the distribution of other public benefits*, must be justified by a governmental purpose. (emphasis ours).

The Comment in the University of Chicago Law Review entitled *"Patronage Dismissals: Constitutional Limits and Political Justifications*, 41 U.Chi.L.Rev. 297 (1974), cited with approval by both the Seventh Circuit and the Supreme Court, places in proper focus the question of whether the constitutional principles stated in decisions relating to a particular form of political patronage should also be applied to other forms of political patronage.

In the introductory part of that Comment, it was stated that "[t]his comment examines the constitutionality of patronage dismissals." *Id.* 298. However, footnote 7 appended to that statement made clear that:

> Although the discussion focuses on the constitutional implications of dismissals from public employment on a partisan basis, it must be noted that public employment is only one form of political patronage. Loyal party supporters are also rewarded with jobs in private industries with which the government does business; public contracts for defense projects, highways, buildings, and insur-

ance; lucrative franchises for the wide range of supplies that the government needs; tax abatements and racing dates; judgeships and attendant courtroom patronage such as receiverships, trusteeships, and refereeships; improved public services for favored wards; and assistance in navigating "the maze of federal and state bureaucracy to obtain the far-ranging services to which they are entitled." M. Tolchin & S. Tolchin, *To The Victor* . . . (1971).

The Comment explains in the concluding part of footnote 7 that its examination of the First and Fourteenth Amendment questions was limited to only one form of political patronage—that reflected by partisan dismissals of public employees. The Comment makes clear, however, that the analysis applicable to that single form of political patronage is generally applicable to other forms of political patronage as well:

> Dismissals from public jobs are here focused upon because they provide the clearest and most easily proven examples of government largesse explicitly denied because of—or conditioned upon—political affiliation or expression. *Although the other forms of patronage are not specifically treated here, much of the analysis of employment dismissals is applicable to the other types of patronage.* (emphasis ours)

The fact that the position of a Missouri Section 136.055 fee agent might be considered as an independent contractor relationship rather than that of an employee as a matter of State tort law is not, in our judgment, a constitutionally significant factor in the determination of this case.

The real factual differences between a person appointed to the position of a Section 136.055 fee agent and a person employed on a full time basis as an "assistant, clerk, or other employee" of the division of collection in the Missouri department of revenue, as authorized by Section 136.040 V.A.M.S., are quite minute. All of the positions authorized by both statutes are concerned with the collection of taxes authorized by the Missouri General Assembly.

About the only factual differences relate (a) to the fact that the position of a Section 136.055 agent is not necessarily a full time position, although it may be, and (b) one appointed to the position of a Missouri fee agent receives his compensation from the additional fees charged the public as authorized by Section 136.055 whereas a person employed on a full time basis to fill one of the positions authorized by Section 136.040 is paid a regular salary out of the funds appropriated to the department of revenue.

Those factual differences do not, in our judgment constitute an appropriate basis for distinguishing the principles of constitutional law articulated in *Elrod* and *Branti* in regard to partisan dismissals of persons in positions of public service. But, even if the partisan dismissal of a Section 136.055 fee agent should be considered as an entirely different form of the general practice of political patronage as that considered in *Elrod* and *Branti*, it is our view that such an assumed different form is so closely similar to that involving the partisan dismissal of a full time public employee as to require application of the same principles of constitutional law enunciated in *Elrod* and *Branti*.

Both *Branti* and *Elrod* spoke in terms of "positions." Neither spoke in terms of "employees," except by way of illustration. *Branti* recognized, as the plurality opinion in *Elrod* had earlier concluded, that "it is not always easy to determine whether a *position* is one in which political affiliation is a legitimate factor to be considered." 445 U.S. at 518, 100 S.Ct. at 1294 (emphasis ours). *Branti* cited Mr. Justice Brennan's conclusion in *Elrod* which stated:

"No clear line can be drawn between policymaking and nonpolicymaking *positions*. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking *position*. The nature of the responsibilities is critical. . . . Thus, the

political loyalty 'justification is a matter of proof, or at least argument, *directed at particular kinds of jobs.*' *Illinois State Employees Union v. Lewis*, 473 F.2d, at 574." 427 U.S., at 367, 96 S.Ct. at 2687 [emphasis ours].

There was, of course, discussion in both *Branti* and *Elrod* of the responsibilities of particular types of "positions" or "jobs" held by particular employees but that discussion was without any suggestion whatsoever that the principles of constitutional law enunciated were to be in any way limited to persons in an employee relationship. Indeed, it is not hard to imagine that one technically categorized under state law as an independent contractor could be endowed by that "position" with policy-making responsibility and thus be outside the rule stated in *Elrod* and *Branti*.

Constitutional analysis must, however, in our judgment, necessarily apply the broader. principles stated and such analysis may not properly be confined to a determination of whether a person in a particular position or job should be classified as an employee or as an independent contractor under State tort law. It is further our view that any application of the common law rules of decisions restated in Section 220 of the Restatement of Agency 2d, which relate to the determination of questions of State law as to when a master is to be held liable for the torts of his servant, has no proper place in the determination of the First and Fourteenth Amendment questions of federal constitutional law presented in this case.

In regard to whether Section 220 of the Restatement of Agency 2d may properly be used in the determination of the federal constitutional question at issue, this case is not entirely dissimilar from *Helvering v. Curran*, 90 F.2d 621, 622 (2d Cir. 1937). In *Helvering*, Judge Learned Hand refused to apply the "definitions" restated in Section 220 in a federal income tax case.[26] Judge

---

**26.** Judge Hand explained that:
 The phrase ["independent contractor"] is not easy to apply, especially to this situation, which is so different from that for which it was

contrived; i. e., to limit imputed liability for the torts of a subordinate. The definitions of it which have been attempted are not true definitions at all; they merely mention those factors

Hand noted that although, under the "definitions" codified and restated in Section 220, a particular person might be classified as an "independent contractor as a matter of state tort law," yet for purposes of federal income tax law, he concluded that "one could hardly be an 'independent contractor,' if one were merely engaged to assist in the routine of a public office, and held by a tenure measured by time, and not by the completion of some specified work."

It would, of course, be proper for a federal court to look to State law, including a State's adoption of the Restatement of Agency 2d, if a question of employee-independent contractor State law were presented, for example, in the Federal Tort Claims Act context. See *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). But to say that is not to say that application of the "definitions" stated in Section 220 of the Restatement of Agency 2d afford a proper basis for depriving persons holding public positions created by Section 136.055 of the protection of the First and Fourteenth Amendments as construed in *Elrod* and *Branti*.

### D.

Whether *Elrod* and *Branti* should be given a broad or narrow reading would seem to be answered by the Supreme Court's discussion of that question in *Branti*. Certainly Mr. Justice Powell was correct when he stated in his dissenting opinion in *Branti* that "the Court today *continues* the evisceration of patronage practices begun in *Elrod v. Burns*, 427 U.S. 437, [96 S.Ct. 2673, 49 L.Ed.2d 547] (1976)." 445 U.S., at 521, 100 S.Ct., at 1296 [emphasis ours]. And in footnote 2 on page 522 of 445 U.S., 100 S.Ct. page 1296, Mr. Justice Powell commented in dissent that the majority in *Branti* suggested, if indeed it did not hold, "that the Court preserves no constitutional distinction between selection and dismissal of public employees."

Judge Broderick's district court opinion in *Finkel v. Branti*, 457 F.Supp. 1284 (S.D.N.Y.

1978), shows that counsel in that case urged a narrow reading of *Elrod* in the district court and that counsel had assumed that "the holding of the concurrence in *Elrod* constitutes the rule of that case" under what counsel called the "least common denominator" test. Although Judge Broderick concluded that the plaintiffs were entitled to prevail "even if the *Elrod* concurrence is taken to be the applicable law," he stated several reasons in footnote 9 on page 1289 of 457 F.Supp. which he believed would support a broader reading of *Elrod* than the reading dictated by the " 'least common denominator' test." We agree with what Judge Broderick said in that footnote and we believe that the Supreme Court also agreed with what was there stated when it affirmed the judgment for the plaintiff in that case.

For when *Branti* reached the Supreme Court, counsel for the petitioner again urged that *Elrod* be given a narrow reading and that it "should be read to prohibit only dismissal resulting from an employee's failure to capitulate to political coercion." 445 U.S. at 516, 100 S.Ct. at 1293. *Branti* expressly rejected counsel's narrow reading of the *Elrod* argument for two reasons. First, because:

> Such an interpretation would surely emasculate the principles set forth in *Elrod*. While it would perhaps eliminate the more blatant forms of coercion described in *Elrod*, it would not eliminate the coercion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order to retain one's job" (445 U.S., at 516, 100 S.Ct., at 1293).

And secondly, *Branti* concluded that because "[m]ore importantly, petitioner's interpretation would require the Court to repudiate entirely the conclusion of both Mr. Justice Brennan and Mr. Justice Stewart that the First Amendment prohibits the dismissal of a public employee solely because of his private political beliefs" (445 U.S., at 516–517, 100 S.Ct., at 1294). We

which the courts ordinarily take into account; as good a summary of these as any is in section

220 of the Restatement of Agency. (90 F.2d 622)

conclude that termination of an independent contractor solely because of his political beliefs would likewise result in a "coercion of belief" and contravene the prohibitions of the First and Fourteenth Amendments.

We find ourselves in the same position as Judge Broderick in *Branti*. Although we are satisfied that the combination of *Elrod* and *Branti* require a much broader reading than that adopted by Judge Cahill in *Sweeney*, and by Judge Nangle in *Fox & Co.*, we conclude that plaintiffs in this case must prevail even if we take the *Elrod* concurrence to be the applicable law.

### E.

For the reasons stated and for purposes of clarity on appeal, we expressly reject all of the defendants' proposed conclusions of law. For purposes of clarity on appeal, we state the following additional conclusions of law based generally on the conclusions proposed by plaintiff but modified in accordance with our view of the applicable law:

1. The Court has jurisdiction over this matter pursuant to §§ 1331, 1343, 2201 and 2202 of Title 28 of the U.S.Code.

2. All plaintiffs have established by the weight of the credible evidence that they are being terminated from their Section 136.055 RSMo. 1978 fee agent appointments solely on the basis of their private political beliefs.

3. The fact that plaintiffs may have an independent contractor relationship with the State as a matter of State tort law, rather than an employer-employee relationship, is not a constitutionally significant factor in the determination of the First and Fourteenth Amendment questions presented in this case.

4. Defendants have failed to establish that political loyalty is an appropriate requirement for the effective performance of a Section 136.055 fee agent's duties as provided in that statute.

5. Plaintiffs have been deprived of their constitutional rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States, as construed by the Supreme Court in *Elrod* and *Branti* under our findings of fact as above stated.

6. Plaintiffs are entitled to declaratory and injunctive relief, their costs and reasonable attorney's fees and expenses.

### IV. *Remedy*

It is clear from our findings of fact and conclusions of law and this memorandum opinion that plaintiffs are entitled to appropriate equitable relief, an award of attorney's fees and expenses, and their costs.

Counsel are familiar with the procedures agreed upon in regard to the determination of questions relating to the award of attorney's fees and expenses agreed to at the close of the case to avoid the fragmentation of any appeals which may be taken in connection with this case. All of the filings required in connection with the attorney's fees and expenses question have not yet been made. It is therefore appropriate to afford counsel an opportunity to agree upon the form of final judgment and decree to be entered and, hopefully, to agree upon the amount of attorney's fees and expenses to be entered as a part of that final judgment.

Accordingly, it is

ORDERED (1) that counsel for plaintiffs shall promptly prepare a form of final judgment and decree which shall include appropriate blank spaces for the amount of attorney's fees and expenses to be awarded and submit the same to counsel for defendants for approval as to form. Counsel for defendants shall promptly advise the Court of their agreement or disagreement in regard to the form proposed by counsel for plaintiffs. It is further

ORDERED (2) that should counsel for the parties be unable to agree upon the form of final judgment and decree as above stated, counsel for the defendants shall submit a form agreeable to them so that the Court may resolve any disagreement under the circumstances.